# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LINDA LANDAN**, **HOLLY AND LINDSEY,** | ) | |
| **LLC**, **JEFFREY J. SIKIRICA**, Trustee for | ) | |
| B.L. MCCANDLESS, LP., **B.L. MCCANDLESS,** | ) | |
| **LP**, **BROAD LAND PA, LLC**, **BLAZIER** | ) | |
| **DRIVE, LLC,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 2:12cv926 |
| | ) | **Electronic Filing** |
| **WAL-MART REAL ESTATE BUSINESS** | ) | |
| **TRUST**, **WAL-MART  STORES EAST, LP**, | ) | |
| **WAL-MART  STORES, INC.**, S. ROBSON | ) | |
| **WALTON**, President, **BRIAN CORNELL**, | ) | |
| President Wal-Mart Real Estate, **MICHAEL T.** | ) | |
| **DUKE**, EVP**, CHARLES M. HOLLEY, JR.,** | ) | |
| CFO, Walmart Realty**,** | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

Plaintiffs commenced this action seeking damages arising from a land development

agreement that contemplated the construction of a "225 prototype" Wal-Mart supercenter.

Plaintiffs maintain that the parties entered an enforceable agreement in the form of a ground

lease and defendants then breached that agreement by failing to execute it.  Presently before the

court is defendants' motion for summary judgment.  For the reasons set forth below, the motion

will be granted.

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(A).  Rule 56 "'mandates

the entry of summary judgment, after adequate time for discovery and upon motion, against a

party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial.'" <u>Marten v. Godwin</u>, 499 F.3d 290, 295 (3d Cir. 2007) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986)).  Deciding a summary judgment motion requires the court to view the facts, draw all reasonable inferences and resolve all doubts in favor of the nonmoving party.  <u>Doe v. Cnty. of Centre, Pa.</u>, 242 F.3d 437, 446 (3d Cir. 2001).

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim.  <u>Nat'l State Bank v. Fed. Reserve Bank of New York</u>, 979 F.2d 1579, 1581-82 (3d Cir. 1992).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial*," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  <u>Matsushita Electric Industrial Corp. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (<u>quoting</u> Fed. R. Civ. P. 56(E)) (emphasis in <u>Matsushita</u>).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita</u>, 475 U.S. at 586.  The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" . . . "and cannot simply reassert factually unsupported allegations." <u>Williams v. Borough of West Chester</u>, 891 F.2d 458, 460 (3d Cir. 1989).  Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." <u>Harter v. GAF Corp.</u>, 967 F.2d 846, 852 (3d Cir. 1992); <u>Sec. & Exch. Comm'n v. Bonastia</u>, 614 F.2d 908, 914 (3d Cir. 1980) ("[L]egal conclusions, unsupported by documentation of specific facts,

2

are insufficient to create issues of material fact that would preclude summary judgment."). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990). If the non-moving party's evidence is merely colorable or lacks sufficient probative force summary judgment may be granted. Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiff establishes the background set forth below. On March 3, 2005, plaintiff B.L. McCandless, L.P. ("B.L. McCandless") purchased a parcel of land slightly larger than eleven acres located at 555 Blazier Drive in Wexford, Pennsylvania ("Parcel No. 1") through a bankruptcy sale. (Doc. Nos. 58, at ¶ 1; 61, at ¶ 66). In doing so, B.L. McCandless successfully outbid defendant Wal-Mart Real Estate Business Trust ("Wal-Mart Real Estate") for the parcel. (Doc. No. 61, at ¶ 67). Following this sale, Wal-Mart's representative Kevin Dougherty ("Dougherty") contacted plaintiff Linda Landan ("Landan"), a managing member of B.L. McCandless, and asked that she meet with Jeff Doss ("Doss"), a representative of Wal-Mart Real Estate. (Doc. No. 61, at ¶ 69). At their subsequent meeting Doss made Landan an offer to purchase Parcel 1, but Landan refused. (Id. at ¶ 70). However, Landan did express interest in negotiating a lease for the property. (Id.)

Wal-Mart Real Estate was interested in leasing Parcel 1 for the purpose of building a "225 prototype" superstore. (Doc. Nos. 61, at ¶ 71; 73, at ¶ 71). During the discussions with Landan it was indicated that Wal-Mart Real Estate would require an area larger than Parcel 1. (Doc. No. 61, at ¶ 71). In an effort to acquire the needed acreage, B.L. McCandless initiated

efforts to obtain a 2.8 acre parcel adjacent to Parcel 1 ("Parcel 3") in July 2005. (Doc. No. 58, at ¶ 2). B.L. McCandless purchased Parcel 3 on October 15, 2005. (Doc. No. 58, at ¶ 5). Throughout the remainder of 2005, representatives of Wal-Mart Real Estate and B.L. McCandless discussed the possibility of negotiating a lease for these properties, but did not come to an agreement. (Doc. No. 58, at ¶ 3).

Throughout these negotiations Landan negotiated primarily with Mary Rottler[1] ("Rottler"), a Senior Director of Real Estate for defendant Wal-Mart Stores, Inc. ("Wal-Mart Stores"). (Doc. No. 58, at ¶ 6). Plaintiffs claim that "[a]n oral agreement was entered into in March, 2006 between Mary Rottler and B.L. McCandless," although the terms of this supposed agreement and the circumstances of its formation are not detailed. (Doc. No. 61, at ¶ 73). Defendants dispute that a binding oral agreement was ever entered into by the parties. (Doc. No. 73, at ¶ 73). Despite the existence of any oral agreement, negotiations continued until a Letter of Intent ("LOI") was executed on June 28, 2006.[2] (Doc. Nos. 58, at ¶ 7; 61, at ¶ 76; 66). Landan sent the LOI to Rottler. It began: "[i]t is my pleasure to submit the following proposal to Wal-Mart to lease the premises known as Blazier Drive, Wexford, PA." (Doc. No. 66).

The LOI purported to set forth the terms of a lease for a site of "approximately 19 acres" (the "Site") which consisted of three individual adjacent parcels: Parcels 1 and 3 and an additional 5.1 acre parcel ("Parcel 2").[3] (Id., at p. 1). By the document's own provisions, the

---

[1] Rottler's maiden name was Svoboda, (Docket No. 58, at ¶ 6), which appears on several of the exhibits submitted.

[2] The first version of the LOI is dated April 5, 2006. (Doc. No. 66).

[3] B.L. McCandless entered into an option contract for Parcel 2 in September of 2006, at a cost of $8,000 per month. (Doc. No. 61, at ¶ 79). Although not reflected in any of the parties' written drafts, B.L. McCandless also entered into a contract to purchase a fourth adjacent parcel (the

LOI was "intended as an outline of the major provisions of a proposed lease between [B.L. McCandless] and [Wal-Mart Stores]." (Id., at p. 5). The initial term of this proposed lease was to be twenty years, with sixteen consecutive five year options to follow. (Id., at p. 2). The LOI clarified its "non-binding" character, "whether or not countersigned." (Id., at p. 5). In fact, it went on to specify that "[n]either party shall have any obligation to the other with respect to this proposal and the matters set forth herein unless and until a mutually acceptable lease agreement is *fully executed* and delivered by both parties." (Id.) (emphasis added).

The LOI contained several tentative and/or conditional aspects. First, it was expressly indicated that its "provisions are subject to withdrawal and modification by either party at any time for any reason." (Id.). Further, it provided that "[a]ny acts or undertakings, or costs or expenses incurred by either party in furtherance of, or in conducting due diligence with respect to, th[e] proposal, are made, done and incurred at such party's own expense." (Id.). The proposed lease also was noted to be contingent upon the following: obtaining the governmental approvals and third-party agreements necessary for Wal-Mart Stores to proceed with construction, B.L. McCandless' "*closing the purchase* of parcels 2 and 3," and Wal-Mart Stores' satisfaction with the title to, survey of, and physical condition of the Site. (Id., at pp. 3-4) (emphasis added). Finally, B.L. McCandless was to deliver the Site to Wal-Mart Stores free of any existing tenants, including Bally's Health Club ("Bally's"), Trader Horn, and Brew'ry Outlet North. (Id., at p. 4). Wal-Mart Stores would reimburse B.L. McCandless up to $500,000 for any necessary buy-out of Bally's lease. (Id.).

After the LOI was executed, B.L. McCandless and Rottler began negotiating the terms of a ground lease. (Doc. Nos. 58, at ¶ 17; 61, at ¶ 77). Landan was told that the consummation

---

"Sperling property") in February of 2007. (Id., at ¶ 86). Landan intended to either offer this parcel for sale to Wal-Mart or retain it for future development. (Doc. No. 58, at ¶ 18).

of this deal was important to Wal-Mart Stores given its "affirmative action program," which sought "to increase the number of minority and female owned vendors" with which it deals. (Doc. No. 61, at ¶ 78). The parties produced several drafts of a ground lease between September 9, 2006, (Doc. No. 61, at ¶ 77) and July 3, 2007, (Doc. No. 58, at ¶¶ 32-33).

The July 3, 2007 draft (the "Final Draft") contains substantial editing, both red-line and handwritten, including a change in the name of the party identified as the "Lessor" from B.L. McCandless to Blazier Drive LLC ("Blazier Drive"). (Doc, Nos. 58, at ¶¶ 35, 37; 66-3). Further, the Final Draft references several unattached exhibits and is unexecuted. (Doc, Nos. 58, at ¶¶ 34, 38; 66-3, at pp. 38-61). No modifications were made to the Final Draft by either party after July 3, 2007, and it was never withdrawn from consideration. (Doc. No. 61, at ¶ 95).

Despite the seemingly continuous evolution of the lease's terms beginning in June of 2006, plaintiffs claim that defendants promised execution of leases multiple times during this time frame. Plaintiffs' allege that Rottler first promised twice in mid-October of 2006 that a closing would be held within a couple of weeks, (Doc. No. 61, at ¶¶ 81-82), but communications between Rottler and Landan during December 2006 and January 2007 demonstrate that neither Wal-Mart Stores nor B.L. McCandless was satisfied with the agreement's language as of then, (Doc. No. 58, at ¶¶ 20, 22).[4] While the parties continued to exchange successive drafts, Landan repeatedly communicated deadlines by which she would

---

[4] On December 15, 2006, Rottler sent Landan a bullet point list of issues related to a draft of the lease which assertedly precluded Wal-Mart from executing it. (Doc. No. 58, at ¶ 20). On January 16, 2007, Landan sent an email to Rottler highlighting "several very disturbing issues in the lease," including a default clause which Landan wanted addressed. (Id., at ¶ 22).

back away from the deal unless there was a signed lease. (Docket No. 58, at ¶¶ 24, 26, 27).[5] On May 31, 2007, the then-current term of the Bally's Sublease expired. (Doc. No. 61, at ¶ 87). Landan did not terminate the tenancy and continued to permit Bally's to operate under it. Bally's continued to occupy the premises until at least 2009, (Doc. No. 73, at ¶ 87), and a subsequent email sent by Landan on July 28, 2007, explained that Bally's "rejected the $500,000 buy out number but [is] willing to relocate or terminate their lease," (Doc, No. 58, at ¶ 40).

Following the delivery of the Final Draft, Landan sent an email to Rottler asking "can we get the thing closed? What is left here?" (Doc. No. 61, at ¶ 90). At a meeting between the two on August 3, 2007, plaintiffs allege that Rottler once again promised Landan a closing within two weeks. (Id., at ¶ 91). However, less than two weeks later, Landan was threatening to "cut [her] losses on this *proposed* deal and move in a different direction unless this is done very soon." (Doc. No. 58, at ¶ 41) (emphasis added). On August 15, 2007, an email from Rottler to Landan shows there were a number of outstanding items that had to be addressed in order to finalize the lease.[6] (Id., at ¶ 42). Later that day, Landan requested a list of "requested restrictions, explaining that "[s]ome restrictions I will agree to." (Id., at ¶ 43). Then, on August 23, 2007, Landan emailed Rottler threatening "an increase in the ground rent if we go

---

[5] On April 24, 2007, Landan stated in an email to outside counsel for B.L. McCandless, "If this is not finished by May 16, I am pulling this deal." (Doc. No. 58, at ¶ 24). On May 5, 2007, she explained to Rotter that "After Friday I am done. . . . I will give this property to Westinghouse." (Id., at ¶ 26). Then on June 1, 2007, Landan emailed outside counsel for B.L. McCandless and Wal-Mart to explain that she "will feel [no] obligation to Walmart" if she does not receive a signed lease by Tuesday. (Id., at ¶ 27).

[6] Rottler mentions necessary steps "including, but not limited to: obtaining a subordination, non-disturbance and attornment agreement ('SDNA') from Fidelity Bank; negotiating a Declaration of Restrictive Covenant; reaching a lease termination agreement between the parties and Bally's; negotiating an escrow agreement; drafting agreed-upon notice to surrender forms to be sent to existing tenants; obtaining a signed purchase agreement for the Zappala property [(Parcel 3)]; and creation of several schedules for the lease." (ECF No. 58, at ¶ 42).

past" September 15. (Id., at ¶ 44). Rottler responded that "Wal-Mart is willing to finish this deal if you have the Bally's issue worked out," but warned that an increase to the amount of rent would mean "our deal is done." (Id., at ¶ 45).

While Landan continued to push for a signed lease on the existing terms, (Doc. Nos. 58, at ¶ 46; 61, at ¶ 62), she also began investigating other options for the site. Even though plaintiffs assert that once again in May of 2008 Rottler stated that the deal was completed and she wanted to have a lease executed in thirty days, (Doc. No. 61, at ¶ 96), Landan took the following steps during that timeframe. First, at some point before June of 2008, Landan began to explore a joint venture with CBL & Associates, Inc. ("CBL") to continue work on the Wal-Mart project. (Doc. No. 58, at ¶¶ 47-51). Second, she entered into negotiations during June of 2008 with existing tenants to extend their leases. (Id., at ¶ 52).[7] Third, on July 15, 2008, Landan actually offered to "sell Walmart th[e] property for a price off [sic] $13 million." (Doc. Nos. 58, at ¶ 53; 58-35, at p. 2). Landan reduced this price once to $11.5 million on August 21, 2008, (Doc. No. 58, at ¶ 58), and again to $10.5 million on November 6, 2008, (id., at ¶ 59). Fourth, beginning in at latest August 2008, Landan began investigating the possibility of selling some or all of the property to third parties. (Id., at ¶ 56).[8]

The parties agree that Wal-Mart Stores discontinued this project in January of 2009, although plaintiffs dispute whether Landon was ever informed of this decision. (Doc. Nos. 61, at ¶ 97; 73, at ¶ 97). Regardless of the lack of notice of Wal-Mart Stores' decision, certain

---

[7] In a June 25, 2008 email from Landan to Rottler she explains that "[i]f we can't get this deal done . . . then I have no choice but to cut a new deal with Trader Horn. I have asked for an increase in their rent to $5.00 psf NNN. They have agreed to this price conditional upon my giving them an extension of the termination notice to 3 years." (Doc. Nos. 58, at ¶ 52; 58-34).
[8] In an August 14, 2008 email to a potential partner developer Landan mentions having to "make a decision by Friday August 15, 2008" concerning the option of "selling off a few pads for $2.5 million dollars." (Doc. No. 58-36, at p. 1). She also mentions an unsolicited offer from Market Place Developers which she "promised to call them back tomorrow to discuss." (Id.).

contingencies mentioned within the LOI remained unsatisfied until at least March of 2009. Specifically, Bally's lease had yet to be terminated. In a March 4, 2009 email from Landan to Rottler, Landan announced that "[i]n an effort to finalize our deal, I will proceed with the termination of [Bally's] lease through the Bankruptcy Court." (Doc. No. 58, at ¶ 60). Further, B.L. McCandless never actually *closed* the purchase of Parcel 2, although it did have a contract to purchase it. (Doc. No. 61, at ¶ 61).

These events culminated in B.L. McCandless filing for bankruptcy on August 8, 2009, (id., at ¶ 98), with plaintiff Jeffrey Sikirica ("Sikirica") being appointed as trustee, (Doc. No. 46, at ¶ 45). The property at issue was sold at a bankruptcy sale on October 25, 2011 to the secured lender. (Doc. No. 61, at ¶ 99). Wal-Mart Stores then began to negotiate with the purchaser and presently is working toward building a store at the Site. (Doc. No. 73, at ¶ 100).

On June 18, 2014, defendants filed a motion for summary judgment with respect to plaintiffs' claim for breach of contract. (Doc. No. 56). Defendants contend that this claim fails as a matter of law because the parties never entered into an enforceable contract. Specifically, plaintiffs have failed to establish a sufficiently definite oral agreement, and any oral agreement to enter into a ground lease in the future would be an unenforceable agreement to agree. To the extent that an oral agreement could reasonably be found, it would be unenforceable under the Statute of Frauds. Further, as the LOI required any enforceable agreement to be in writing and executed by both parties, no enforceable written contract was ever formed because the Final Draft was never executed. Further, the "draft" nature of the Final Draft and the objective conduct of the parties demonstrate that there was never an agreement to essential terms. Finally, defendants assert that plaintiffs never satisfied certain identified prerequisites to reaching a binding agreement.

In response, plaintiffs contend there was a valid oral agreement to enter into a ground lease which was formed in March of 2006. The subsequent LOI satisfied the requirements of the Statute of Frauds, making the oral agreement enforceable. The Final Draft then became a binding written agreement, because at that juncture the parties agreed on the essential terms and all that remained was formal execution. From plaintiffs' perspective, the handwritten and redline changes to the Final Draft do not preclude recognition of the document as an enforceable contract because it is common for such an agreement to exhibit such markups. Additionally, Landan should be permitted to testify as to her motivations for any conduct that objectively could be viewed as contrary to her understanding that a binding agreement was in place. Finally, plaintiffs maintain that any stated conditions precluding a valid contract sufficiently had been satisfied.

"To state a claim for breach of contract under Pennsylvania law, a plaintiff must allege (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." Chemtech Int'l, Inc. v. Chem. Injection Technologies, Inc., 247 F. App'x 403, 405 (3d Cir. 2007) (internal citations omitted). The existence of an enforceable contract is a question of "(1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration." ATACS Corp. v. Trans World Commc'ns, Inc., 155 F.3d 659, 666 (3d Cir. 1998). "[W]hen the record contains conflicting evidence regarding intent, the question of whether the parties formed a completed contract is one for the trier of fact." Channel Home Centers, Div. of Grace Retail Corp. v. Grossman, 795 F.2d 291, 300 n.9 (3d Cir. 1986). Where there is no genuine issue of material fact, the court may determine the parties' intention to be bound as a matter of law. See EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 263-64 (3d Cir. 2010).

"In assessing intent, the object of inquiry is not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 582 (3d Cir. 2009) (citing Ingrassia Constr. Co., Inc. v. Walsh, 486 A.2d 478, 483 (Pa. Super. Ct. 1984)). While "preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract," Channel Home Centers, 795 F.2d at 298, an agreement does not have to be memorialized in a writing to be effective. "[I]t is well-settled in Pennsylvania that where the parties have settled upon the essential terms and the only remaining act to be done is the formalization of the agreement, the latter is not inconsistent with [a] present contract." Melo-Sonics Corp. v. Cropp, 342 F.2d 856, 859-60 (3d Cir. 1965). However, "when one party has expressed an intent not to be bound until a written contract is executed, the parties are not bound until that event has occurred." Schulman v. J.P. Morgan Inv. Mgmt., Inc., 35 F.3d 799, 808 (3d Cir. 1994) (citing Essner v. Shoemaker, 143 A.2d 364 (Pa. 1958)).

Although a valid oral agreement is generally all that is required to bind the parties to perform, "oral contracts to convey real estate violate the Statute of Frauds and are unenforceable." Concorde Investments, Inc. v. Gallagher, 497 A.2d 637, 640 (Pa. Super. Ct. 1985); see 33 Pa. Cons. Stat. § 1. As such, "[u]nder Pennsylvania law, a lease of real property for a term of more than three years must be made in writing and signed by the parties creating the lease." Flight Sys., Inc. v. Elec. Data Sys. Corp., 112 F.3d 124, 127 (3d Cir. 1997) (citing 68 Pa. Cons. Stat. § 250.202)). This writing "requirement can be met by creation of a written memorandum that need not consist of one single document." Hessenthaler v. Farzin, 564 A.2d 990, 992 (Pa. Super. Ct. 1989). A writing signed by the party to be charged can incorporate other writings if those writings are either physically attached or sufficiently identified. Id. (citing Restatement (First) of Contracts § 208 (1932)). A prior oral agreement can also be

11

incorporated by such a writing which "sufficiently indicat[es] the terms of the oral agreement so that there is no serious possibility of consummating fraud by its enforcement." Strausser v. PRAMCO, III, 944 A.2d 761, 765 (Pa. Super. Ct. 2008).

When the terms of an agreement to convey an interest in land are not sufficiently indicated by a signed writing, its proponent faces a high burden of proof. See Firetree, Ltd. v. Dep't of Gen. Servs., 978 A.2d 1067, 1075 (Pa. Commw. Ct. 2009). "'[T]erms of the contract must be shown by full, complete, and satisfactory proof,' and the plaintiff must provide evidence 'of such weight and directness as to make out the facts alleged *beyond a doubt*.'" Id. (quoting Kurland v. Stolker, 533 A.2d 1370, 1373 (Pa. 1987)) (emphasis in original). Courts have found this burden to have been satisfied in only a few circumstances. See, e.g., Nakles v. Union Real Estate Co. of Pittsburgh, 204 A.2d 50 (Pa. 1964) (prospective tenant signed lease and paid one month's rent, although landlord never signed lease); Zlotziver v. Zlotziver, 49 A.2d 779 (Pa. 1946) (seller admitted the existence of the oral contract under oath); Greenwich Coal & Coke Co. v. Learn, 83 A. 74 (Pa. 1912) (donee of land took possession, made improvements, and lived there for 20 years).

Plaintiffs argue that there are two binding agreements at issue here. First, plaintiffs assert that "[a]n oral agreement was entered into in March, 2006 between . . . Rottler and B.L. McCandless" to enter into a ground lease. (Doc. No. 61, at ¶ 73). Second, the parties agreed that the Final Draft constituted an enforceable contract because at that juncture all material terms had been finalized and the only remaining step was formal execution of the document.

As will now be discussed in detail, the record fails to contain sufficient evidence to support a finding of an enforceable contract in either of these instances.[9]

With respect to the oral agreement allegedly entered into in March of 2006, plaintiffs' position is less than a model of clarity. On one hand, plaintiffs assert that the March 2006 oral agreement required that "Wal-Mart Stores would enter into a ground lease with B.L. McCandless." (Doc. No. 70, at p. 2). Along these lines, Landan explained in her deposition that she was promised verbally that if she did certain things asked of her, Wal-Mart "would sign a contract with [her]." (Doc. No. 64-2, at p. 2). On the other, plaintiffs appear to be arguing that this oral agreement represented a binding ground lease on its own. Plaintiffs contend that this "oral agreement had definite terms and reflected the intent of both parties to be bound by the agreement and provided for consideration." (Doc. No. 77, at p. 2). Whichever position plaintiffs are attempting to advance, neither is grounded in sufficient evidence.

To the extent plaintiffs maintain that there was an oral agreement which would have required Wal-Mart to sign a contract at some point in the future after the satisfaction of certain conditions, such an oral agreement was nothing but an unenforceable "agreement to agree." See MDL Capital Mgmt., Inc. v. Fed. Ins. Co., 274 F. App'x 169, 171 (3d Cir. 2008). "[I]t is well established that evidence of preliminary negotiations or a general agreement to enter a binding contract in the future fail as enforceable contracts because the parties themselves have not come to an agreement on the essential terms of the bargain and therefore there is nothing for the court to enforce." ATACS Corp., 155 F.3d at 666 (citing Goldman v. McShain, 247

---

[9] Given that no binding agreements could be found to have existed between the parties, it is unnecessary to consider defendants' argument that plaintiffs' failure to satisfy certain stated conditions precluded contract formation. However, this argument would fail because "an unfulfilled condition does not impede the formation of a valid contract. Instead, . . . the inquiry is whether the unfulfilled condition postponed the duty to perform under the contract." Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Bd., 739 A.2d 133, 139 (Pa. 1999).

A.2d 455, 458 (Pa. 1968)).  Therefore, to the extent plaintiffs argue that defendants orally agreed to sign a lease in the future, that position fails because such an agreement lacks sufficient essential terms and would be unenforceable.

Plaintiffs also have failed to adduce sufficient facts for a reasonable jury to conclude that the parties formed a binding oral lease agreement in March of 2006.  Plaintiffs repeatedly assert that "[a]n oral agreement was entered into in March, 2006 between Mary Rottler and B.L. McCandless."  (Doc. Nos. 61, at ¶ 73; 70, at pp. 1-2; 77, at pp. 1-2).  These assertions merely amount to a legal conclusion which, on its own, is insufficient to preclude summary judgment.  Bonastia, 614 F.2d at 914.  Plaintiffs do summarily conclude that this alleged "oral agreement had definite terms and reflected the intent of both parties to be bound by the agreement and provided for consideration."  (Doc. No. 77, at p. 2).  However, no specific facts uncovered during discovery support the existence of any of the three essential elements of an enforceable contract at this juncture.  See ATACS Corp., 155 F.3d at 666.

More specifically, establishing the element of intent appears to be plaintiffs' most formidable challenge.  Plaintiffs point to no specific facts which support the parties' manifestation of intent to be bound by an oral agreement in March of 2006.  The existing evidence actually compels the opposite conclusion.  In particular, the parties' first version of the LOI was produced on April 5, 2006, only days after the asserted formation of the oral agreement.  In its final form, the LOI began with Landan indicating that it was her "pleasure to submit the following revised *proposal* to Wal-Mart."  (Doc. No. 66, at p. 1) (emphasis added).  The LOI makes no reference to any prior oral agreement.  In fact, the LOI makes it clear that no binding lease existed between the parties at that point.  (Id. at p. 5) ("This lease proposal is intended only as an outline of the major provisions of a proposed lease between Landlord and Tenant, and as such, whether or not countersigned, is non-binding.").  In addition, none of the

parties is even alleged to have mentioned an existing oral agreement during the course of the negotiations. Thus, there is no evidence of an enforceable March 2006 oral agreement to enter into a ground lease and all objective evidence negates the existence of such an agreement.

No reasonable jury could conclude that the parties manifested the intent to be bound by an oral agreement in March of 2006 based on the evidence of record. As such, plaintiffs have failed to establish a genuine issue of material fact with regard to this essential element of their claim for breach of an oral agreement, and summary judgment is proper. See Celotex Corp., 477 U.S. at 322-23.

Even if plaintiffs could establish a genuine issue with respect to the existence of a binding oral agreement, any such agreement would be unenforceable under the Statute of Frauds. As a lease of real property with a term of more than three years, the purported March 2006 agreement must have been in writing and signed by the parties to be enforceable. Flight Sys., Inc., 112 F.3d at 127. Plaintiffs argue that the statute's writing requirement was satisfied by the LOI. (Doc. No. 77, at p. 3). Assuming the LOI separately satisfies the statute, this argument still skips a necessary logical step. While the terms of an oral lease agreement can be incorporated into a subsequent writing which independently satisfies the Statute of Frauds, that writing must "sufficiently indicate the terms of the oral agreement so that there is no serious possibility of consummating fraud by its enforcement." Strausser, 944 A.2d at 765.

Here, the LOI cannot have the effect of incorporating a prior oral agreement because it fails to recognize that such an agreement exists. To the contrary, it expressly refutes the existence of such an agreement. Any other writings relevant to this matter share this lack of recognition, in addition to lacking signatures. This leaves the purported March 2006 oral agreement without a writing sufficient to satisfy the statute. Without a sufficient writing, an oral lease agreement will only be enforced if circumstances demonstrate its existence beyond a

15

doubt.  <u>See</u> <u>Firetree, Ltd.</u>, 978 A.2d at 1075.  As defendants are not alleged to have admitted the agreement's existence under oath, taken possession of the property or paid rent, any oral lease agreement entered by the parties in March of 2006 would be unenforceable under the Statute of Frauds.  <u>Id.</u>

Plaintiffs also have failed to establish a genuine issue of material fact regarding the existence of a written agreement between the parties.  Plaintiffs concede that the LOI did not establish a binding lease agreement.  (Doc. No. 70, at p. 4).  They nevertheless contend that the parties' conduct clearly demonstrates the intent to be bound by the terms of the Final Draft.  (<u>Id.</u>, at pp. 5-10).  This is so despite the Final Draft's lack of execution.  (<u>Id.</u>, at p. 4).

Plaintiffs' arguments on this score fail for two reasons.  First, the parties specifically contemplated that execution was necessary to establish a binding agreement.  (Doc. No. 66, at p. 5).  Second, a reasonable jury could not conclude, based on objective manifestations of assent, that the parties intended to be bound by the terms of the Final Draft.

Plaintiffs' assertion that the lack of execution does not preclude the Final Draft from being enforced as a binding contract fails to identify sufficient evidence to overcome the effect of the LOI.  Plaintiffs correctly note that the failure to formalize an agreement alone will not preclude its enforcement when the parties have settled on all of its essential terms.  <u>Melo-Sonics Corp.</u>, 342 F.2d at 859-60.  "As a general rule, signatures are not required unless such signing is expressly required by law or by the intent of the parties."  <u>Shovel Transfer & Storage, Inc.</u>, 739 A.2d at 136.  But, "if the parties themselves contemplate that their agreement cannot be considered complete, and its terms assented to, before it is reduced to writing, no contract exists until the execution of the writing."  <u>Essner</u>, 143 A.2d at 366 (Pa. 1958).

Here, the parties clearly intended that their agreement would only be binding upon formal execution of a written lease.  The LOI, the only signed agreement between the parties,

explicitly states that "[n]either party shall have any obligation to the other with respect to this proposal and the matters set forth herein unless and until a mutually acceptable lease agreement is fully executed and delivered by both parties." (Doc. No. 66, at p. 5). Plaintiffs admit that the LOI was executed before the parties even began negotiating a ground lease. (Doc. No. 61, at ¶ 77). Although Wal-Mart never formally withdrew from negotiations after the circulation of the Final Draft and no other modifications were made to it by either party, (id., at ¶ 95), it is undisputed that neither the Final Draft nor any other draft lease was ever signed. Even separate proof of actual acceptance is insufficient to form a binding agreement when the parties fail to satisfy a contractual term requiring formal execution. Schulman, 35 F.3d at 807-08 (summary judgment was proper against the proponent of an unsigned lease agreement which expressly required execution and delivery to be binding, even though the purported tenant took possession of the premises, made improvements, paid rent, and received letters from the landlord's representatives confirming the lease). As such, the parties' failure to sign and deliver the Final Draft precludes its enforcement here.

Even if the lack of execution did not preclude the formation of a binding written agreement, plaintiffs have failed to establish a genuine issue of material fact as to whether such an agreement was formed. As discussed above, an agreement cannot become binding until the parties have manifested an intent to be bound by it. ATACS Corp., 155 F.3d at 666. In the absence of an explicit acceptance, "'an offer may be accepted by conduct and what the parties d[o] pursuant to th[e] offer' is germane to show whether the offer is accepted." Accu-Weather, Inc. v. Thomas Broad. Co., 625 A.2d 75, 78 (Pa. Super. Ct. 1993) (quoting Gum, Inc. v. Felton, 17 A.2d 386, 389 (Pa. 1941)). To determine whether there has been an acceptance, "the court considers the parties' outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions." Stamerro v. Stamerro, 889 A.2d 1251, 1258 (Pa.

Super. Ct. 2005). Plaintiffs argue that the parties' course of conduct demonstrates their recognition of a binding agreement. (Doc. No. 70, at p. 6 (citing Accu-Weather, Inc., 625 A.2d at 78)). This argument lacks any evidentiary support.

Plaintiffs have never alleged and no evidence shows that defendants explicitly or implicitly assented to the terms of any written document exchanged by the parties. Instead, plaintiffs rely on purported assurances by Rottler to Landan that a closing would occur within a couple weeks as demonstrating Wal-Mart's acceptance. (Doc. No. 70, at p. 5 (citing Doc. No. 61, at ¶¶ 81, 82, 91)). Viewed in isolation, a reasonable jury could view these assurances as an assent to a final agreement. However, the context and undisputed facts preclude such a finding.

The record undisputedly reveals that these assurances were premised on an intent to work toward finalizing a lease; not an acknowledgment that one had been reached. Following Rottler's first assurance of a closing in October of 2006, (Doc. No. 61, at ¶ 81, 82), the parties continued to negotiate the terms of the lease. (Id. at ¶ 80). They exchanged at least one additional draft before the Final Draft was circulated on July 3, 2007. (Id., at ¶¶ 88-89). In an email to Rottler on January 16, 2007, Landan herself pointed out that "there are several very disturbing issues in the lease. One is the default clause. . . . We need to either delete this or find an answer to this horrible one sided language." (Doc. No. 58, at ¶ 22) (alteration in original). This position in itself defeats plaintiffs' contention that an enforceable ground lease had been finalized when the assurance was made in October of 2006.

Rottler made a similar assurance that a closing was imminent in August of 2007. Less than two weeks after this assurance, Landan sent her an email threatening to "just cut my losses on this *proposed* deal and move in a different direction unless this is done very soon." (Doc. No. 58, at ¶ 41) (emphasis added). Three weeks later Landan threatened to raise the rent if the

18

deal did not become finalized. She also negotiated new leases with existing tenants and offered to sell the property outright. Clearly, not even Landan believed that a binding lease agreement had been formed following Rottler's promises to close.

Plaintiffs do not point to any other conduct by defendants which could support a jury finding that defendants either assented to an enforceable agreement or believed that a binding agreement had been formed. Instead, they are forced to explain how Landan's conduct is consistent with her own belief that such an agreement was in place. Plaintiffs argue that each time Landan threatened to withdraw from negotiations if a certain deadline passed, (Doc. No. 58, at ¶¶ 24, 26, 41, 43, 44), she was only "bluffing" in order to force Wal-Mart's hand, (Doc. No. 70, at pp. 6-7). But Landan took several actions following the circulation of the Final Draft that were inimical to the position that the parties had agreed on a final, enforceable agreement and the only thing left was to execute it. She renegotiated an existing lease with Trader Horn. (Doc. No. 58, at ¶ 52). She investigated possible joint ventures in pursuit of the Wal-Mart lease. (Id., at ¶¶ 47, 55). And she considered potential sales of the Site. (Id., at ¶¶ 53, 56, 58, 59).

Plaintiffs argue that all of these measures were simply efforts to mitigate damages, and Landan "should be allowed to testify to a jury as to the motivations behind her actions and statements." (Doc. No. 70, at pp. 6-8). But Landan's "undisclosed and subjective intentions" have no bearing on the inquiry at hand. Stamerro, 889 A.2d at 1258. The question is whether the statements and conduct of the parties can be found to reflect a manifestation of an agreement to be bound. Considering only Landan's objective manifestations, a reasonable jury could not conclude that she believed the Final Draft was binding.

The Final Draft itself also undermines the proposition that a jury can find that the parties agreed to a final, binding agreement. Although this version of the document was never

19

withdrawn from consideration or subject to additional modifications, the Final Draft is still very much in "draft" form.  There are numerous red-line edits and handwritten changes throughout the document.  (Doc. Nos. 58, at ¶ 37; 66-3).  Significantly, one of the red-line edits alters the name of the party identified as the "Lessor" from B.L. McCandless to Blazier Drive, LLC.  (Doc. No. 66-3, at pp. 1, 34, 38).  Handwritten changes modify the time periods during which Wal-Mart could terminate the lease for any reason.  (Doc. Nos. 58, at ¶ 37; 66-3, at p. 15).  A handwritten note in the "Contingencies" section of the lease also indicates that someone needed to "Revise" eight lines of text.  (Doc. No. 66-3, at p. 20).  These revisions were not further identified.  In addition, none of the eighteen exhibits for which the Final Draft contains placeholders are attached to the document.  (Id., at pp. 40-61).  In short, the Final Draft is not in a form which appears ready for execution.  Instead, it reflects ongoing negotiations between the parties.

Given the foregoing facts, summary judgment against plaintiffs on their claim for breach of a written agreement is proper.  Plaintiffs have adduced insufficient evidence to support a finding that both parties assented to a written agreement or came to an understanding that a binding written agreement existed.  In other words, plaintiffs have failed to identify evidence that will sufficiently support a finding that defendants had the intent to enter into an existing agreement that the parties both agreed was binding.  As this is an essential element of their claim, summary judgment is proper.  Celotex Corp., 477 U.S. at 322-23.

For the reasons set forth above, plaintiffs have failed to identify sufficient evidence to proceed with their breach of contract claim, and therefore defendants' motion for summary

judgment (Doc. No. 56) will be granted.  An appropriate order will follow.

<u>Date: March 31, 2015</u>

<u>s/David Stewart Cercone</u><br>
David Stewart Cercone<br>
United States District Judge

cc:    Marvin Leibowitz, Esquire<br>
       Ronald W. Crouch, Esquire<br>
       Kevin Batik, Esquire

       (*Via CM/ECF Electronic Mail*)