**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **LINDA LANDAN**, **HOLLY AND LINDSEY,** )<br>**LLC**, **JEFFREY J. SIKIRICA**, Trustee for )<br>B.L. MCCANDLESS, LP., **B.L. MCCANDLESS,** )<br>**LP**, **BROAD LAND PA, LLC**, **BLAZIER** )<br>**DRIVE, LLC,** )<br> )<br> Plaintiffs, )<br> )<br> v. )<br> )<br>**WAL-MART REAL ESTATE BUSINESS** )<br>**TRUST**, **WAL-MART STORES EAST, LP**, )<br>**WAL-MART STORES, INC.**, **S. ROBSON** )<br>**WALTON**, President, **BRIAN CORNELL**, )<br>President Wal-Mart Real Estate, **MICHAEL T.** )<br>**DUKE**, EVP**, CHARLES M. HOLLEY, JR.,** )<br>CFO, Walmart Realty**,** )<br> )<br> Defendants. ) | 2:12cv926<br>**Electronic Filing** |

## OPINION

Plaintiffs commenced this action seeking damages arising from a land development deal that contemplated a ground lease and the construction of a "225 prototype" Wal-Mart supercenter. Plaintiffs maintain that defendants made an enforceable promise regarding a ground lease being negotiated between the parties, which plaintiffs relied on to their detriment. Presently before the court is defendants' motion for summary judgment on plaintiffs' remaining claim for promissory estoppel. For the reasons set forth below, the motion will be granted.

I.      PROCEDURAL BACKGROUND

After granting summary judgment to defendants on plaintiffs' breach of contract claim, (Doc. No. 91), the Court granted leave to plaintiffs to reinstate their prior claim for promissory estoppel. (Doc. No. 102). The promissory estoppel claim had been dismissed without prejudice as inconsistent with prosecution of the breach of contract claim. (Doc. No. 36). However, the Court concluded in its March 31, 2015 opinion granting summary judgment that there was

insufficient evidence to establish that a contract had been entered into between the parties. (Doc. No. 90). After reinstatement of the promissory estoppel claim the parties were afforded an additional period of discovery. (Doc. No. 102). Defendants now move for summary judgment on the promissory estoppel claim. (Doc. No. 103).

II.     SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(A). Rule 56 "'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). Deciding a summary judgment motion requires the court to view the facts, draw all reasonable inferences and resolve all doubts in favor of the nonmoving party. Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

The moving party bears the initial burden of identifying evidence, which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim. Nat'l State Bank v. Fed. Reserve Bank of New York, 979 F.2d 1579, 1581-82 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial*," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(E)) (emphasis in Matsushita). An issue is genuine only if the evidence is such

that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. The non-moving party "must present affirmative evidence in order to defeat a properly supported motion . . . and cannot simply reassert factually unsupported allegations." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989). Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992); Sec. & Exch. Comm'n v. Bonastia, 614 F.2d 908, 914 (3d Cir. 1980) ("[L]egal conclusions, unsupported by documentation of specific facts, are insufficient to create issues of material fact that would preclude summary judgment."). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990). If the non-moving party's evidence is merely colorable or lacks sufficient probative force summary judgment may be granted. Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

III.     FACTUAL BACKGROUND

The record as read in the light most favorable to plaintiffs establishes the background set forth below.[1]  On March 3, 2005, plaintiff B.L. McCandless, L.P. ("B.L. McCandless")

---

[1] Most of these facts previously were detailed in the Court's opinion granting summary judgment on plaintiffs' breach of contract claim. (Doc. No. 90)  In filing their motion for summary judgment on the promissory estoppel claim defendants filed a Renewed Concise Statement of

3

purchased a parcel of land slightly larger than eleven acres located at 555 Blazier Drive in Wexford, Pennsylvania ("Parcel No. 1") through a bankruptcy sale. (Doc. Nos. 58, at ¶ 1; 110, at ¶ 66). In doing so, B.L. McCandless successfully outbid defendant Wal-Mart Real Estate Business Trust ("Wal-Mart Real Estate") for the parcel. (Doc. No. 110, at ¶ 67). Following this sale, Wal-Mart's representative Kevin Dougherty ("Dougherty") contacted plaintiff Linda Landan ("Landan"), a managing member of B.L. McCandless, and asked that she meet with Jeff Doss ("Doss"), a representative of Wal-Mart Real Estate. (Doc. No. 110, at ¶ 69). At their subsequent meeting, Doss made Landan an offer to purchase Parcel 1, but Landan refused the offer. (Id. at ¶ 70). However, Landan indicated she would negotiate regarding a ground lease. (Id.)

Wal-Mart Real Estate was interested in Parcel 1 for the purposes of building a "225 prototype" superstore. (Doc. No. 110, at ¶ 71). During the discussions with Landan it was indicated that Wal-Mart Real Estate would require an area larger than Parcel 1 for a superstore. (Doc. No. 110, at ¶ 71). In negotiations regarding the potential ground lease in July 2005, defendants expressed that the offer "shall not be considered binding until a lease agreement is signed by all parties." (Doc. 110-10 [Ex. 8: 7/27/2005 correspondence from Jeff Doss to Linda Landan]).

Indeed, both the lease proposal dated September 15, 2005, sent from Landan to Doss, and the subsequent Letter of Intent dated April 5, 2006 and executed by June 28, 2006 ("LOI,"

---

Material Facts (Doc. No. 105), incorporating by reference their earlier Concise Statement of Material Facts and appendix thereto. (Doc. Nos. 58, at ¶¶ 1-65; 58-1 through 58-40). Relative to the present motion, plaintiffs filed a Responsive Concise Statement of Material Facts (Doc. No. 110), which provides responses to defendants' Renewed Concise Statement, (Doc. No. 110, at ¶¶ 1-65), differing from their earlier responses as to certain paragraphs, and providing additional material facts. (Doc. No. 110, at ¶¶ 66 through 103). For purposes of the present motion and facts, the Court considers plaintiffs' current response (Doc. No. 110) to the paragraphs of Doc. No. 58 as incorporated by Doc. No. 105. (Doc. No. 110).

"April 5, 2006 LOI" or "executed April 5, 2006 LOI"),[2] included the identical terms as

follows:

> This lease proposal is intended only as an outline of the major provisions of a proposed lease between Landlord and Tenant, and as such, whether or not countersigned, is non-binding. <u>Neither party shall have any obligation to the other</u> with respect to this proposal and the matters set forth herein <u>unless and until a mutually acceptable lease agreement is fully executed and delivered by both parties</u>.

> The provisions of this proposal are subject to withdrawal and modification by either party at any time for any reason. <u>Any acts or undertakings, or costs or expenses incurred by either party in furtherance of</u>, or in conducting due diligence with respect to, <u>this proposal, are made, done and incurred at each party's own expense</u>. . . .

> <u>Whether or not a lease agreement is ultimately consummated</u>, the parties agree that the confidential information shall not be disclosed to third parties . . . .

(Doc. Nos. 110-11, Ex. 9 at p. 5; 110-14, Ex. 12 at p. 6) (emphasis added).

In an effort to acquire the needed acreage for the deal, B.L. McCandless purchased a

2.8-acre parcel adjacent to Parcel 1 ("Parcel 3") in October 2005. (Doc. No. 110, at ¶ 73).

Throughout the remainder of 2005, representatives of Wal-Mart Real Estate and B.L.

McCandless discussed the possibility of negotiating a lease for these properties, but did not

come to an agreement. (Doc. No. 105, at ¶ 3). Landan negotiated primarily with Mary Rottler

née Svoboda ("Rottler"), a Senior Director of Real Estate for defendant Wal-Mart Stores, Inc.

("Wal-Mart Stores"). (Doc. No. 105, at ¶ 6). Plaintiffs maintain and defendants dispute that an

oral agreement for a ground lease was entered into in March 2006 between the parties. (Doc.

No. 110, at ¶ 74).

---

[2] Plaintiffs refer to the LOI dated April 5, 2006, as having been executed on April 5, 2006, and also as having been executed on June 28, 2006, and the exhibit appears to bear a date on the page executed by defendants of June 28, 2006. (Doc. Nos. 110-14, at p. 7; 112, at ¶ 7). For purposes of the present motion, whether the date of execution is April 5, 2006 or June 28, 2006 is immaterial.

The April 5, 2006 Letter of Intent executed by the parties, (Doc. No. 112, at ¶ 7), was sent from Landan to Rottler, and began: "[i]t is my pleasure to submit the following proposal to Wal-Mart to lease the premises known as Blazier Drive, Wexford, PA." (Doc. No. 110-14, at p.2). The negotiations continued before and after the LOI was drafted and executed. (Doc. Nos. 110, at ¶¶ 7, 33, 70, 71, 76, 78; 110-10). The LOI purported to set forth the terms of a lease for a site of "approximately 19 acres" (the "Site") which consisted of three individual adjacent parcels: Parcels 1 and 3 and an additional 5.1-acre parcel ("Parcel 2").[3] (Doc. No. 110-14, at p. 2). By its own provisions, the LOI was "intended as an outline of the major provisions of a proposed lease between [B.L. McCandless] and [Wal-Mart Stores]." (Id., at p. 6). The initial term of this proposed lease was to be twenty years, with sixteen consecutive five year options to follow. (Id., at p. 3).

As with the September 15, 2005 lease proposal, the LOI clarified its "non-binding" character as to the ground lease, "whether or not countersigned." (Id., at p. 6). The LOI expressly indicated, "the provisions of this [lease] proposal are subject to withdrawal and modification by either party at any time for any reason." (Id.). The proposed lease also was noted to be contingent upon the following: obtaining the governmental approvals and third-party agreements necessary for Wal-Mart Stores to proceed with construction, B.L. McCandless' "closing the purchase of parcels 2 and 3," and Wal-Mart Stores' satisfaction with the title to, survey of, and physical condition of the Site. (Id., at pp. 4-5). Finally, B.L. McCandless was to deliver the Site to Wal-Mart Stores free of any existing tenants, including

---

[3] B.L. McCandless entered into an option contract for Parcel 2 in September of 2006, at a cost of $8,000 per month. (Doc. No. 110, at ¶ 81). Although not reflected in any of the parties' written drafts, B.L. McCandless also entered into a contract to purchase a fourth adjacent parcel (the "Sperling property") in February of 2007. (Id., at ¶ 88). Landan intended to either offer this parcel for sale to Wal-Mart or retain it for future development, (Doc. No. 105, at ¶ 18), but maintains it was purchased in reliance on Wal-Mart's promises. (Doc. No. 110, at ¶ 88).

Bally's Health Club ("Bally's"), Trader Horn, and Brew'ry Outlet North. (Id., at p. 5). Wal-Mart Stores would reimburse B.L. McCandless up to $500,000.00 for any necessary buy-out of Bally's lease. (Id.). However, Bally's rejected the buy-out. (Doc. No. 58, at ¶ 40).

For purposes of the motion for summary judgment on the breach of contract claim, plaintiffs admitted that B.L. McCandless prepared the LOI, (Doc. No. 61, at ¶ 8), but now in opposition to the motion for summary judgment on the promissory estoppel claim dispute that fact and contend that it was prepared by both parties and that certain provisions were included at "Wal-Mart's behest," compare (Doc. Nos. 61 & 110, at ¶¶ 9-11), with Landan having "merely typed it up." (Doc. No. 110-5, at p.15). Plaintiffs indicate that Wal-Mart specifically required the following provisions be included in the LOI executed by the parties: that the lease proposal whether or not countersigned was non-binding; that neither party had any obligation to the other unless and until a mutually accepted lease agreement was fully executed and delivered by both parties; that provisions of the lease proposal were subject to withdrawal and modification by either party at any time and for any reason; and that any acts or undertakings, costs, or expenses incurred by either party in furtherance of the lease proposal were made and done at that party's own expense. (Doc. No. 110, at ¶¶ 9-11).

After the LOI was executed, the parties began negotiating the terms of a ground lease. (Doc. Nos. 58, at ¶ 17; 110, at ¶ 78). According to plaintiffs and William Fox, who was counsel for B.L. McCandless until early 2007, they were told in May of 2006 by defendants that the deal was important to Wal-Mart Stores to obtain affirmative action goals regarding women-owned vendors with which it deals. (Doc. Nos. 110, at ¶¶ 79, 86; 110-6 [Fox Dep. at 21]). Rottler further stated to them that B.L. McCandless "was the first female owned development company with whom Wal-Mart was going to do a deal," (Doc. No. 110-6, [Fox Dep. at 21]), and it was "critical that the deal be completed." (Doc. No. 110-6 [Fox Dep. at

22]).  Fox believed at that time that "the business terms of the deal were, if not all negotiated, substantially negotiated."  (Doc. No. 110-7 [Fox Dep. at 22]).  Attorney Fox admittedly did not think Wal-Mart had signed any ground lease agreement, yet believed there was an agreement between the parties for a ground lease, (Doc. No. 110-7 [Fox Dep. at 25]), despite the requirements of the Statute of Frauds.  Nevertheless, the parties produced several drafts of a ground lease between September 9, 2006 and July 3, 2007.  (Doc. No. 105, at ¶¶ 32-33; 110, at ¶¶ 78, 82, 90, 91).

Regarding parcel 2, plaintiffs assert that they purchased it in September 2006, (Doc. No. 118, at p. 7), and describe events which transpired regarding the parcel:  "Ms. Landan and bank representative Hudson Stoner placed a conference call to Ms. Rottler of Wal-Mart. During the call, the bank representative explained that Fidelity had approved a loan for the purchase of parcel number 2."  (Doc. No. 110, at ¶ 80).  When Landan inquired when the lease would be executed and closed, Rottler told her the deal had been approved and would be executed in two weeks.  (Doc. No. 110, at ¶ 80).  Plaintiffs then supposedly closed on parcel 2.[4]  (Doc. No. 110, at ¶ 80).  In October 2006, Rotter again indicated to Landan that a closing on a ground lease would occur in a couple of weeks.  (Doc. No. 110, ¶ 83).  Furthermore, Landan asked for Wal-Mart to pay an option payment due on certain of the property involved with the ground lease, and Wal-Mart "refused."  (Doc. No. 110, at ¶¶ 83, 84).

Ultimately, the parties ended with the July 3, 2007 final draft of the ground lease, also referred to by plaintiffs as the "final ground lease," which contained substantial editing, both

---

[4] Plaintiffs assert that they purchased parcel 2, admit that they never purchased parcel 2, and state that they had a contract to purchase parcel 2.  See (Doc. Nos. 110, at ¶ 61; 118, at 7).  For the promissory estoppel claim, it matters not whether they paid for a contract to purchase, paid for the parcel or paid for an option contract, though the inconsistencies in Plaintiffs statements, perhaps due to nothing more than imprecise language, as to this and other matters for consideration by the Court is perplexing.

red-line and handwritten.  (Doc. Nos. 105, at ¶ 37; 110, at ¶ 91).  Further, it referenced several unattached exhibits.  (Doc. Nos. 105, at ¶ 38).  No modifications were made to this version of the ground lease by either party after July 3, 2007, no further versions were produced, and it was neither withdrawn from consideration nor executed.  (Doc. No. 110, at ¶ 97).

Despite the seemingly continuous evolution of the negotiations and the lease's terms, plaintiffs claim that defendants promised execution of a ground lease multiple times during this period.  Plaintiffs allege that Rottler promised twice in mid-October of 2006 that a closing regarding the ground lease would be held within a couple of weeks, (Doc. Nos. 110, at ¶¶ 83-84; 110-6 [Fox Dep. at 17](regarding October 10, 2006 conversation that  Rotter indicated closing would occur in a couple of weeks)), but communications between Rottler and Landan during December 2006 and January 2007 indicate that neither Wal-Mart nor B.L. McCandless was then satisfied with the agreement's language.  (Doc. No. 105, at ¶¶ 20, 22).  While the parties continued to exchange successive drafts, Landan repeatedly communicated deadlines by which she indicated she required a signed lease or would back away from the deal with no obligation to Wal-Mart.  (Docket No. 105, at ¶¶ 24, 27).  On May 31, 2007, the then-current term of the Bally's sublease expired.  (Doc. No. 110, at ¶ 89).

On July 26, 2007, following the delivery of the July 3, 2007 final draft of the ground lease, Landan sent an email to Rottler asking, "Can we get the thing closed?  What is left here?" (Doc. No. 110, at ¶ 92).  At a meeting on August 3, 2007, Rottler once again indicated that a closing would occur within two weeks.  (Id., at ¶ 93).  Less than two weeks later, Landan in an email to Rottler indicated she would just "cut [her] losses on this *proposed* deal and move in a different direction unless this is done very soon.  So either sign this thing in 10 days or I am going to start negotiations with another tenant.  I just can't wait any longer." (Doc. No. 105, at ¶ 41) (emphasis added).

Referring to a date as early as August 15, 2007, plaintiffs assert "the damages as a result of promissory estoppel occurred before this period of time."  (Doc. Nos. 105, at ¶ 43; 110, at ¶ 43).  On August 15, 2007, an email from Rottler to Landan shows there still were a number of outstanding items that had to be addressed in order to finalize the lease. (Doc. No. 105, at ¶ 42).  Later that day, Landan requested a list of "requested restrictions, explaining, "[s]ome restrictions I will agree to."  (Id., at ¶ 43).  Then, on August 23, 2007, Landan emailed Rottler indicating there would be an "an increase in the ground rent if we go past" September 15, 2007.  (Id., at ¶ 44).  Rottler responded that "Wal-Mart is willing to finish this deal if you have the Bally's issue worked out," but warned that an increase to the amount of rent would mean "our deal is done."  (Id., at ¶ 45).  Landan continued to push for execution of the ground lease, (Id., at ¶ 46), which never occurred.  Plaintiffs also assert that in May of 2008 Rottler stated that the deal was completed and she wanted the lease executed in thirty days.  (Doc. No. 110, at ¶ 98).

Landan took the following steps after the period by which plaintiffs claim they incurred the damages relevant to the promissory estoppel claim: Landan began to explore a joint venture with another entity to continue work on the Wal-Mart project, (Doc. No. 105, at ¶¶ 47-51); she entered into negotiations with existing tenants to extend their leases, (Id., at ¶ 52); she offered to sell Wal-Mart the property at various prices, (Doc. Nos. 105, at ¶¶ 53, 58-59); and she began investigating the possibility of selling some or all of the property to third parties.  (Id., at ¶ 56).  Plaintiffs characterize these acts as done in mitigation and after incurring the damages from the promissory estoppel.  (Doc. No. 110, at ¶¶ 43, 47-52, 55-58).

Wal-Mart Stores discontinued this project with Plaintiffs in January of 2009.  (Doc. Nos. 110, at ¶ 99).  Certain contingencies mentioned within the LOI remained unsatisfied until at least March of 2009, including that the Bally's lease had not been terminated.  (Doc. No.

105, at ¶¶ 60, 61). These events culminated in B.L. McCandless filing for bankruptcy on August 8, 2009. (Doc. No. 110, at ¶ 98). The properties at issue, some of which had been purchased at an earlier bankruptcy sale in another matter, were in turn sold at a bankruptcy sale on October 25, 2011 to the secured lender. (Doc. No. 110, at ¶ 101). Wal-Mart Stores then began to negotiate with the new purchaser of the properties and presently is working toward building a store thereon. (Doc. Nos. 73, at ¶ 100; 110, at ¶ 102).

As to damages, plaintiffs assert in their Second Amended Complaint that as a result of defendants' conduct, plaintiffs "were required to spend in excess of $2,000,000 (two million dollars) to comply with the [executed April 5, 2006] Letter of Intent[,] in reasonable reliance upon the assurances, demands, promises and representations of Defendants[;]" B.L. McCandless, L.P. was forced to file Chapter 11 Bankruptcy; Plaintiffs lost ownership of properties in a bankruptcy sale; and Plaintiffs lost other "potential business opportunities." (Doc. No. 46 at pp. 12-13). Plaintiffs nevertheless contend that their damages for purposes of the promissory estoppel claim occurred prior to August 15, 2007. (Doc. Nos. 105, at ¶ 43; 110, at ¶ 43).

### A. Sham Affidavit Contention

Defendants argue that the Declaration of Landan, (Doc. No. 112), submitted in opposition is a "sham affidavit" interposed solely to defeat the present motion for summary judgment. (Doc. No. 115, at p. 3). The sham affidavit rule permits a district court to disregard an affidavit or declaration interposed in opposition to summary judgment where it contradicts the declarant's prior testimony under oath without a plausible explanation for the contradiction. Hackman v. Valley Fair, 932 F.2d 239, 241 (3d Cir. 1991). Thus, a party cannot manufacture a material issue of fact to avoid summary judgment. Plaintiffs point out that the statement defendants rely on in Landan's deposition to claim that her declaration is a sham—namely, that

Landan testified in response to the question whether she and Rottler had agreed on the rent amount as of March 2006, that she did not remember but imagined she did—is of little probative value as Landan immediately thereafter in the deposition explained what she contended were the details of the March 2006 oral agreement between the parties. (Doc. No. 118 at 3 citing p. 113 and 114 of Landan Deposition). Under these circumstances, the sham affidavit rule really is not in play and the Court will consider the content of the declaration for in assessing plaintiffs' position.

**B. Summary Judgment Opinion Regarding Breach of Contract**

The Court determined in its prior summary judgment opinion that the record failed to contain sufficient evidence to support a finding of an enforceable contract as to either an oral agreement to enter a ground lease or a final ground lease. (Doc. No. 90, at pp. 12-13). The alleged oral agreement requiring Wal-Mart to execute a contract in the future after the satisfaction of certain conditions was nothing more than an unenforceable "agreement to agree." (Id., at p.13) (citing MDL Capital Mgmt., Inc. v. Fed. Ins. Co., 274 F. App'x 169, 171 (3d Cir. 2008)).

This Court held that "[n]o reasonable jury could conclude that the parties manifested the intent to be bound by an oral agreement in March of 2006 based on the evidence of record." (Doc. No. 90, at p.15). This Court further held that even if plaintiffs could establish the existence of a binding oral agreement, it would be unenforceable under the Statute of Frauds because the purported March 2006 oral agreement was a lease of real property with a term of more than three years, requiring that it be in writing and signed by the parties to be enforceable. (Id., at p.15). No writing existed in the record to satisfy the Statute of Frauds. This Court specifically opined that the LOI could not satisfy the Statute of Frauds because the LOI failed to recognize that an agreement existed and instead expressly refuted the existence of

12

such an agreement.  (Id., at pp. 14-15).  The other writings in the record failed in this aspect as well and additionally lacked signatures.  (Id., at pp. 15).

IV.    ANALYSIS

The Court now turns to plaintiffs' promissory estoppel claim.  Pennsylvania has adopted the theory of promissory estoppel established by the Restatement (Second) of Contracts § 90, which requires plaintiffs here to show: 1) that defendants made a promise that defendants should have reasonably expected to induce action or forbearance on the part of plaintiffs; 2) plaintiffs actually took action or refrained from taking action in reliance on that promise; and 3) enforcing the promise is the only way to avoid injustice.  Crouse v. Cyclops Indus., 745 A.2d 606, 610 (Pa. 2000); Edwards v. Wyatt, 335 F.3d 261, 277 (3d Cir 2003); RESTATEMENT (SECOND) OF CONTRACTS, § 90 (1981).  "Promissory estoppel is an equitable remedy to be implemented only when there is no contract; it is not designed to protect parties who do not adequately memorialize their contracts in writing."  Luther v. Kia Motors America, Inc., 676 F. Supp. 2d 408, 421 (W.D. Pa. 2009) (internal quotations and citations omitted).

A promissory estoppel claim requires proof by clear and convincing evidence, Josephs v. Pizza Hut of America, Inc., 733 F.Supp. 222 (W.D. Pa. 1989) (citing Blofsen v. Cutaiar, 333 A.2d 841, 844 (Pa. 1975)) of the following elements: 1) misleading words or conduct by the defendants; 2) unambiguous proof of the plaintiffs' reasonable reliance on the misrepresentation; and 3) the plaintiffs have no duty of inquiry.  Luther, 676 F. Supp. 2d at 421.  Moreover, the alleged promise must be an express promise and cannot be a broad and vague implied promise.  C & K Petroleum Products, Inc. v. Equibank, 839 F.2d 188, 192 (3d Cir. 1988) ("Promissory estoppel would be rendered meaningless if this Court were to allow [plaintiff] to maintain an action for detrimental reliance based on the alleged existence of such a broad and vague implied promise.").  The action taken in reliance also must constitute a

substantial change in position.  Kaufman v. Mellon Nat'l Bank and Trust Co., 366 F.2d 326, 332 (3d Cir. 1966).  Furthermore, "[t]here can be no estoppel when the plaintiffs' actions were the result of their own will and judgment rather than the product of the defendants' agent's representations."  Josephs v. Pizza Hut of America, Inc., 733 F. Supp. 222, 227 (W.D. Pa. 1989), aff'd 899 F.2d 1217 (3d Cir. 1990).

The Pennsylvania Supreme Court has considered comment b to the Restatement Second of Contracts § 90 instructive as to whether to enforce the promise.  Thatcher's Drug Store of West Goshen, Inc. v. Consolidated Supermarkets, Inc., 636 A.2d 156, 160 (Pa. 1994).

Comment b provides:

> The principle of this section is flexible.  The promisor is affected only by reliance which he does or should foresee, and enforcement must be necessary to avoid injustice.  Satisfaction of the latter requirement may depend on the reasonableness of the promisee's reliance, on its definite and substantial character in relation to the remedy sought, on the formality with which the promise is made, on the extent to which the evidentiary, cautionary, deterrent and channeling functions of form are met by the commercial setting or otherwise, and on the extent to which such other policies as the enforcement of bargains and the prevention of unjust enrichment are relevant.  The force of particular factors varies in different types of cases: thus reliance need not be of substantial character in charitable subscription cases, but must in cases of firm offers and guaranties.

RESTATEMENT (SECOND) OF CONTRACTS, § 90 (1981), cmt. b (character of reliance protected)(internal citations omitted).

### A.  Statute of Fraud Considerations

Where the alleged promise relied on is an oral agreement that should have been reduced to an executed writing per the Statute of Frauds or the alleged promise is to consummate such an oral agreement with an executed writing, promissory estoppel threatens to swallow whole the rule established by the Statute of Frauds.  See International Products & Technologies, Inc. v. IOMEGA Corp., 1989 WL 138866, at *6 (E.D. Pa. Nov. 15, 1989).  Pennsylvania Courts are wary to find promissory estoppel applicable where a contract has failed for lack of a signed

14

writing between the parties lest a party evade the Statute of Fraud's requirements through this equitable doctrine.

The Pennsylvania Supreme Court instructed in <u>Polka v. May</u>, 118 A2d 154 (Pa. 1955), that "the principle of estoppel may not be invoked against the operation of the statute of frauds." <u>Polka</u>, 118 A.2d at 156; <u>see</u> <u>Borrello v. Lauletta</u>, 317 A.2d 254, 255 (Pa. 1974) (declining to enforce option pursuant to estoppel theory due to Statute of Frauds); <u>see</u> <u>also</u> <u>168th and Dodge, LP v. Rave Reviews Cinemas, LLC</u>, 501 F.3d 945, 957 (8th Cir. 2007) (business entity charged with knowledge of statute of frauds requirement for twenty year lease could not succeed on estoppel claim). Nevertheless, it appears that where there is an actual agreement though not in satisfaction of the Statute of Frauds, and all of the elements of promissory estoppel are met, some recovery may be had. To that end, the Pennsylvania Supreme Court further opined in <u>Polka</u> that "[u]nder the interpretation that has been given our statute of frauds a recovery of damages may be had for nonperformance of *a parol agreement* for the sale of land, the measure of such damages being the money that was paid on account of the purchase and the expenses incurred on the faith of the contract." 118 A.2d at 156 (emphasis added); <u>cf.</u> <u>Ridley Park Shopping Center, Inc. v. Sun Ray Drug Co.</u>, 180 A.2d 1, 3 (Pa. 1962) ("Where there is a taking of possession as a result of a parol agreement, . . . equitable considerations require that leasehold interest created by parol be enforced."). In this vein, the district court in <u>Josephs</u> opined that if the elements of promissory estoppel are met in a case where the Statute of Frauds would require a signed agreement in writing, a plaintiff can recover but the remedy is limited to detrimental reliance damages; "benefit of the bargain" and "lost opportunity" damages are unavailable.

Here, the Statute of Frauds thwarted plaintiffs' attempts to pursue this case on breach of contract theory. <u>See</u> Opinion of March 31, 2015 (Doc. No. 90) at 15. It also provides an

15

obstacle to their pursuit of a claim for promissory estoppel.  Following <u>Polka</u> and <u>Josephs</u>, if plaintiffs could succeed on their estoppel claim, plaintiffs would be barred by the Statute of Frauds from recovering damages for "benefit of the bargain" or "lost opportunity."  But because there are several reasons why a reasonable jury could not find for plaintiffs on their claim for promissory estoppel, the court need not determine whether the Statute of Frauds acts as a complete or only a partial bar to recovery.

### B.  Lack of Express or Definite Promise

This Court previously determined that based on the record evidence, a reasonably jury could not find that the parties did in fact come to an agreement.  Nevertheless, in responding to the present motion for summary judgment, plaintiffs continue to express that they had an agreement for the lease of the property.  (Doc. No. 118, at p. 3).  Plaintiffs never clearly state just precisely what promises were made upon which they ground their claim for promissory estoppel and when precisely those promises were made.

In general, plaintiffs contend that Wal-Mart's agents made promises on multiple occasions and over a span of time that never came to fruition such as: a closing on the ground lease would occur in two weeks; a closing would occur in a few weeks; a closing would occur in 30 days; an executed lease would happen in 30 days; the deal had been approved and the ground lease would be executed; Wal-Mart wanted to do the deal; Wal-Mart wanted the deal executed in 30 days; Rottler would make sure this deal gets completed and executed; and there was a done deal.  (Doc. Nos. 110, at ¶¶ 80, 83, 85, 93, 98; 110-5, at p. 9).  Plaintiffs assert in the Second Amended Complaint that they relied on the promises of the LOI.  (Doc. No. 46, at ¶ 54, Second Amended Complaint) ("Plaintiffs reasonable relied on the Letter of Intent dated April 5, 2006.").  Yet, by their own admission, plaintiffs at a minimum were involved in preparing and typing up the LOI that they executed.  It expressly provided that an executed

16

written agreement between the parties was required and the parties were to bear their own costs in furtherance of the deal. Thus, plaintiffs now concede that the LOI they executed would contradict the claimed promises, so they argue that the promises were made prior to the LOI. (Doc. No. 109, at p. 7). At times, plaintiffs also argue that the promises upon which they relied were ones made after the LOI was executed. (Doc. No. 109, at p. 5). For example, they state "an express promise was made by Ms. Rottler in October 2006. This promise was repeated on many occasions by a number of representatives." (Doc. No. 109, at pp. 5-6).[5] Plaintiffs also appear to point to the claimed oral ground lease agreement allegedly reached sometime in March 2006 as the promise for estoppel purposes. (Doc. No. 118, at p. 3).

The lack of plaintiff's ability to identify clearly delineated promises for the Court's consideration reveals a serious weakness in their claim for promissory estoppel. Not only are plaintiffs vague in this regard, but the writings between the parties makes clear that they intended not to have an enforceable agreement unless and until it was reduced to writing and executed. This understanding was reflected in the LOI and is consistent with the July 2005 offer letter from Doss and the September 2005 proposal. Even as indicated in what Plaintiffs' refer to as the final ground lease, the parties indicated the lease would not be effective until after it was executed by both parties. (Doc. Nos. 110-11, Ex. 9 at p. 5; 110-14, Ex. 12 at p. 6; 110-17, at p.1). In addition, statements such as the lease would be executed or a closing would

---

[5] Plaintiffs assert that a Wal-Mart document reveals that the lease actually was approved by Wal-Mart Real Estate Committee, citing to their Response CSMF ¶ 103, (Doc. No. 110 ¶ 103 & Ex. 23). The document is titled "WAL-MART STORES, INC. Real Estate-Dropped Project and contains the phrase "Real Estate Comm. Approval: 4/7/2008." No context or explanation regarding the document is given and there is no indication that plaintiffs ever acted in reliance on this document as there also is no indication that it was provided to plaintiffs prior to the lawsuit. Moreover, plaintiffs contend that their promissory estoppel damages were incurred prior to August 15, 2007. (Doc. No. 110, at ¶ 43). Indeed, they assert regarding the document that Wal-Mart did not inform Landan that the project had been cancelled. (Doc. No. 110, at ¶ 98).

be held in two weeks still contemplate the need for an executed lease and closing.  Plaintiffs' position is unclear, inconsistent, constantly shifting, and ultimately unavailing.

Defendants argue that the alleged promises or assurance to execute a lease in the future are insufficient for promissory estoppel as they are too vague and indefinite.  (Doc. No. 104, at p. 4).  They cite KSM Associates, Inc. v. ACS State Healthcare, LLC, 2006 WL 1308267 (E.D. Pa. May 10, 2006), which involved a letter of intent addressing the intent to negotiate and execute a formal, comprehensive services agreement.  The letter of intent provided for a set cap in compensation to the plaintiff for labor and material expenditures to be made prior to the execution of the agreement.  The contemplated project schedule required immediate hiring and project planning.  During one of the weekly conference calls held by representatives of the parties, a representative of defendant indicated plaintiff had been hired to do whatever it took to make the upcoming project date.  2006 WL 1308267 at *3.  Prior to a final executed services agreement, defendant gave notice of termination to plaintiff.

The court granted summary judgment to the defendant in KSM Associates on the plaintiff's claim for promissory estoppel even though the plaintiff adduced evidence that the defendant proclaimed the service agreement was being finalized, was forthcoming, only required the insertion of payment dates, and was "done."  2006 WL 1308267, *2.  The court held the promises were too broad and vague to support a claim for promissory estoppel as the terms of the finalized contract remained unresolved even if the statements by the defendant constituted a promise to execute a services agreement.  Despite the cap on payment in the letter of intent, the plaintiff took the statement "do whatever it took" to mean the plaintiff was to act to meet the final delivery date at any reasonable cost, which as it turned out was well above the initial amount authorized in the letter of intent.  Under the circumstances, the court held that the plaintiff could not proceed on its claim for promissory estoppel regarding its decision to

18

provide services beyond the set cap amount for pre-existing expenses because to do so would be contrary to what was stated in the parties' letter of intent.

As with KSM Associates, the writing between the parties here expressly contradicts both the claimed promise of a deal and plaintiff's position that Wal-Mart is now responsible to reimburse all of plaintiffs' expenditures in furtherance of the deal. In the context of the ongoing negotiations and the closing that consistently was not scheduled, the statements of a done deal or that a closing and executed documents would be forthcoming were at best vague and aspirational; at the very least, they were not definite promises on which plaintiffs objectively and reasonably could rely. Expressions of future intention "do not constitute a sufficiently definite promise." In re Phillips Petroleum Securities Litigation, 881 F.2d 1236, 1250 (3d Cir. 1989) (statement of the defendant's intent to sell back stock on a basis equal to all other stockholders not sufficiently definite); 168th and Dodge, LP, 501 F.3d at 957 (promise of a done deal insufficient); cf. MDL Capital Mgmt., Inc., 274 F. App'x at 171 (unenforceable agreement to agree). In sum, the claimed promises relied on here do not constitute the required express promise and are too vague for enforcement under promissory estoppel. [6]

### C.  Reasonable Reliance

Plaintiffs offer that "they expended millions of dollars meeting the Defendants' multiple conditions for entering into a lease and maintaining constant contact indicating that they were waiting for defendants to follow up with their promise to execute the lease. They continued to work to remove previous tenants, acquire new property, and comply with the required tests and evaluations. (Doc. No. 118, at pp. 6-7). The issue for promissory estoppel

---

[6] The asserted importance of the deal to Wal-Mart (Doc. No. 109 at 9) does not provide support for plaintiffs' position that a definite, enforceable promise was made. A proposed business deal can be both important and never come to fruition, which is what happened here.

purposes, however, is whether any of this conduct can be said to have been undertaken in reasonable reliance.

"[T]he degree of sophistication of the parties and the history, if any, behind the negotiation process are relevant factors in ascertaining reasonableness." Greenberg v. Tomlin, 816 F. Supp. 1039, 1056 (E.D. Pa. 1993) (considering whether reliance was reasonable for estoppel claim in context of fraud). Plaintiffs now proclaim that Landan, who negotiated zealously, was not experienced or sophisticated in real estate development, although they cannot deny that she was an experienced businesswoman and she referred to herself as a "developer." (Doc. Nos. 58, at ¶ 56; 109 at 9). Regardless, under the undisputed facts of this case, plaintiffs' reliance was unreasonable as a matter of law.

Thatcher's Drug Store of West Goshen, Inc. v. Consolidated Supermarkets, Inc., 636 A.2d 156 (Pa. 1994), is instructive. Thatcher's Drug Store involved a claim for promissory estoppel by a shopping center pharmacy against the supermarket anchor store that had plans to open a pharmacy. The supermarket had given prior "oral assurances" that it did not intend to operate a competing pharmacy. The pharmacy's lease provided it was prohibited from selling food and the shopping center would not have a competing pharmacy. The competing pharmacy restriction did not apply to a supermarket within the shopping center. At some point, the pharmacy began selling milk and the supermarket responded by posting a sign announcing that a pharmacy was coming soon. When the pharmacy inquired regarding the sign, the supermarket informed the pharmacy "[y]ou get out of the dairy business and we won't open a pharmacy." 636 A.2d at 157. The pharmacy ceased selling the milk and the supermarket removed the sign.

Prior to renewing its lease, the pharmacy sought assurances from the supermarket that it would not open a competing pharmacy. The supermarket representative responded that they

had no intention of opening one.  636 A.2d at 158.  The pharmacy then renewed for ten years.

After renewing, the pharmacy and supermarket had another skirmish, which ended similarly

with the supermarket indicating if the pharmacy did not go into the soda business the

supermarket would not go into the pharmacy business.  636 A.2d at 158.  Ultimately, the

supermarket decided it would operate a retail pharmacy on its premises.  The pharmacy sued

the supermarket under promissory estoppel.  The trial court enjoined the operation of the

pharmacy by the supermarket, the Superior Court affirmed, and the Pennsylvania Supreme

Court reversed.

In reversing, the Pennsylvania Supreme Court considered the factors in comment b to

the Restatement Second of Contracts § 90, and observed that "reliance was unreasonable,

nothing was done to formalize the promise[,] and no evidentiary, cautionary or deterrent

functions were met under the circumstances."  Thatcher's Drug Store, 636 A.2d at 160.  The

court further opined that "the terms of the agreement were vague and at risk of being

misunderstood."  636 A.2d at 161.  The shopping center lease reserved the supermarket's right

to operate a pharmacy and the promise to the pharmacy "was made with relative informality."

636 A.2d at 161.  The pharmacy was a business entity in a commercial setting renewing its

own lease.  The purported attempt to rely on an indefinitely worded promise that the

supermarket would not operate a competing business showed poor judgment as opposed to

reasonable reliance.

Here, given the commercial setting as well as the documentary evidence, the statements

purportedly relied on by plaintiffs regarding a future closing or executed agreement in two

weeks, a few weeks, or thirty days lacked any formality.  As observed by the Third Circuit in

In re Phillips Petroleum Securities Litigation, such "reliance upon a mere expression of future

intention cannot be 'reasonable.'"  881 F.2d at 1250.

21

Plaintiffs cite <u>Dilworth v. Metropolitan Life Ins. Co.</u>, 418 F.3d 345 (3d Cir. 2005), and <u>Luther v. Kia Motors America, Inc.</u>, 676 F. Supp. 2d. 408 (W.D. Pa. 2009), for the proposition that whether a plaintiff reasonably responded to a promise or reasonably or justifiably relied on a promise or representation is a question of fact reserved for the jury. (Doc. No. 118, at p. 6). While this proposition is applicable in the appropriate setting, plaintiff's attempt to find solace in these cases is misplaced for several reasons.

First, a reasonable "response" is not an element. Second, although <u>Dilworth</u> did reverse the grant of summary judgment on a promissory estoppel claim, the Court of Appeal for the Third Circuit did not hold that reasonable reliance is always a question for the jury. Indeed, the court observed that in certain cases a plaintiff's evidence may be inadequate. 418 F.3d at 354 ("We recognize, of course, that an insured's evidence at trial may be inadequate to prove that her reasonable expectations differ from the provisions of the policy, but in this case [plaintiff] is entitled to do so.").

Finally, neither <u>Luther</u> nor <u>Dilworth</u> support plaintiffs' claim for promissory estoppel. <u>Dilworth</u> involved a coverage action regarding a policy provision that differed from the alleged misrepresentations by the insurer's agents that the policy had a diminishing or vanishing premium. In reversing, the Third Circuit followed Pennsylvania precedent recognizing that under Pennsylvania law it is reasonable for the individual insured to rely on the insurer's agent to understand policy provisions and costs rather than relying on the contents of the policy. 418 F.3d at 354. Accordingly, the insurer could not use the explicit language of the policy to defeat the insured's reasonable expectation where the expectations were based on the agent's representations. Consequently, <u>Dilworth</u> is inapposite as the instant does not involve an individual's reasonable expectations of the scope of coverage under an insurance contract, or the specific provisions in Pennsylvania law regarding same.

Luther involved a claim for promissory estoppel where the plaintiff, an experienced owner of automobile dealerships, became a prospective Kia franchisee. Luther claimed he had been promised a Kia franchise and approval by headquarters was a mere formality. As part of the process, Luther had to make extensive commitments to Kia, spend time and money on forming a corporation, pay for Kia signs and complete a dealership package to be submitted to Kia headquarters for final approval. When he was not awarded a Kia franchise, plaintiff sued for breach of contract and promissory estoppel.

The court in Luther observed:

> [a]t the very beginning of the process, in June 2007, [the plaintiff] signed a
> document stating he understood completion of the application did not imply Kia's
> approval, that applying for a franchise did not obligate Kia to enter into a Dealer
> Agreement, that Kia could accept or reject the application at its sole discretion
> and that any "actions taken, expenditures made, or commitments assumed" were
> at his "sole risk and responsibility." Even if this document itself is not deemed to
> be a contract, . . . it clearly contradicts the content of the alleged oral promises.

676 F. Supp. 2d at 423 (internal citations omitted). Against this backdrop, the court held that "[w]hile we recognize that determining whether reliance on a representation is reasonable or justifiable is generally a question of fact for the jury, for a sophisticated businessman to rely on an oral promise in light of the clear written terms of the Kia Application is unreasonable as a matter of law." 676 F. Supp. 2d at 422-23. Because Luther could not show by clear and convincing evidence justifiable or reasonable reliance on the promises, summary judgment in favor of the defendant on the claim for promissory estoppel was appropriate. 676 F. Supp. 2d at 423.

Luther does not support plaintiffs' position. To the contrary, it lends support to defendant's position.

Even assuming that the repeated statements that a closing or execution of the ground lease would occur within a couple of weeks or a month could constitute a definite promise

capable of enforcement, the context of these statements also must be considered in evaluating whether a jury could find plaintiffs' reliance to be reasonable. The record undisputedly reveals that these "assurances" were part of continued negotiations towards finalizing a lease and did not constitute an agreement or an acknowledgment that an agreement had been reached. The repeated nature of the non-existent closing or lease execution alone would dissuade a reasonable party, much less a reasonable businesswoman, from forming the firm belief that the closing would in fact take place. Certainly, if in embarking on further negotiations at the time of the LOI plaintiffs required that they not bear their own costs in pursuing the deal, they simply could have refused to execute a LOI containing such a provision. Indeed, they could have insisted on the contrary before proceeding further. They did not, and this undisputable fact weighs heavily in the consideration of whether plaintiffs have adduced sufficient evidence from which a reasonable jury could find they acted in reasonable reliance.

1. Landan's Inconsistent Conduct

Plaintiffs are forced to explain how certain of Landan's conduct is consistent with the assertion that they reasonably relied on such assurances to their purported detriment. They assert this conduct took place after the promissory estoppel damages were incurred and were undertaken only in mitigation. (Doc. No. 110, at ¶ 43, 47-52, 55-58). For example, following Rottler's assurance of a closing in October of 2006, (Doc. No. 110, at ¶ 83-84), the parties continued to negotiate the terms of the lease. (Doc. Nos. 105, at ¶ 33; 110, at ¶ 82). Rottler made a similar assurance that a closing was imminent in August of 2007—nearly a year later. Less than two weeks after this assurance, Landan sent her an email indicating she would "just cut [her] losses on this *proposed* deal and move in a different direction unless this is done very soon." (Doc. No. 105, at ¶ 41) (emphasis added). Three weeks later Landan threatened to

raise the rent if the deal did not become finalized. Landan also negotiated new leases with existing tenants and offered to sell the property outright.

Plaintiffs now contend that Landan's acts such as threatening to withdraw from negotiations if a certain deadline passed, (Doc. Nos. 105 & 110, at ¶¶ 24, 26, 41, 43, 44), renegotiating an existing lease with Trader Horn, (Doc. No. 105, at ¶ 52), investigating possible joint ventures in pursuit of the Wal-Mart lease, (Id., at ¶¶ 47, 55), and considering potential sales of the Site, (Id., at ¶¶ 53, 56, 58, 59), are irrelevant because she took them after the promissory estoppel damages were incurred. This evidence, however, is consistent with defendants' position that to be binding the deal required an executed written ground lease. To the extent this evidence is not inconsistent with the promissory estoppel claim as advocated by plaintiffs, it is wholly consistent with the plain language of the executed LOI. The acts by Landan likewise do not in any way evidence an understanding that an enforceable agreement had been reached. There is no evidence of any timely expressed protest to the effect that the parties already had an enforceable agreement or promise and Landan, herself, referred to the matter as the "proposed" deal as late as August of 2007. Thus, Landan's own conduct fails to supply evidence of detrimental reliance.

## 2. Enforcement Contrary to the Parties' Signed Writings Is Inappropriate

The executed April 5, 2006 LOI makes clear that the parties did not intend to be bound until a written lease was executed by both parties and plaintiffs' alleged reliance must be evaluated with this in mind. Under well-settled contract principles, "when one party has expressed an intent not to be bound until a written contract is executed, the parties are not bound until that event has occurred." Schulman v. J.P. Morgan Inv. Mgmt., Inc., 35 F.3d 799, 808 (3d Cir. 1994) (citing Essner v. Shoemaker, 143 A.2d 364 (Pa. 1958)). Similarly, on a claim for promissory estoppel, plaintiffs simply cannot show *reasonable* reliance on alleged

25

promises that are contrary to the signed writing of the parties.  See Bennett v. Itochu Intern, Inc., 572 F. App'x 80, 84 (3d Cir. 2014) (reliance was unreasonable as a matter of law where a letter of intent indicated that any binding agreement required a formal written contract); Cf. Schnell v. Bank of New York Mellon, 828 F. Supp. 2d 798 (E.D. Pa. 2011) (The plaintiff could not establish justifiable reliance where the alleged oral promise was followed soon thereafter by a signed written contract explicitly contradicting the promise).  Where a writing executed by the parties contradicts the party's purported understanding of a promise, that would and should give a reasonable person, much less an experienced business person, pause.  Cf. Turner v. Johnson & Johnson, 809 F.2d 90, 96 (1st Cir. 1986) (fraud case); Alexander v. CIGNA Corp., 991 F. Supp. 427, 436 (D. N.J 1998) (in a fraud case it was manifestly unreasonable to rely on a promise where it was contrary to the express contractual language signed by the party).

Here, plaintiffs either prepared and provided the LOI to defendants or as they now contend assented to its requirements as demanded by Wal-Mart.  The LOI's specific terms contradict any reliance regarding defendants being responsible for plaintiffs' expenses in furtherance of the potential deal.  Mellon Bank Corp. v. First Union Real Estate Equity and Mortgage Investments, 951 F.2d 1399, 1412 (3d Cir. 1991) (not reasonable to rely on oral promise that directly contradicts a written agreement between the parties).

The Court of Appeals for the Eleventh Circuit has applied § 90 of the Restatement and rejected a claim for promissory estoppel under similar circumstances.  In Doll v. Grand Union Co., 925 F.2d 1363 (11th Cir. 1991), the defendant supermarket chain concluded that a particular location would be ideal for a new supermarket.  The chain had a former employee, Mr. Lewis Allen ("Allen"), contact developers about building a shopping center at the location with the chain's supermarket as a primary tenant.  Allen contacted Mr. Frederick Ross ("Ross") and through him a real estate development firm.  The development firm along with

Ross liked the proposal and created a joint venture ("the joint venture") to acquire the several parcels of land and build the shopping center. The chain expressed a strong desire to lease the space for a supermarket. The joint venture then obtained options to purchase the necessary parcels from the property owners.

During the negotiations, the chain informed Ross that approval by its real estate board was required in order to proceed. It subsequently notified Ross by letter that the project had been approved. The letter contained some of the provisions of the agreement negotiated by the parties, including the term of the lease, its renewal and rent, and noted board approval was subject to certain contingencies. It further provided that the entire agreement was subject to a written lease that was executed by both parties. Id. at 1365. The contingencies readily resolved. The negotiations as to the final lease, however, "bogged down" and delayed completion of a final executed document. Subsequently, the chain's real estate manager sent his last revisions to the written agreement and stated that the parties shared "relief in a final resolution on this document." 925 F.2d at 1366.

The parties learned after the last revisions were sent but before an executed lease that the Georgia Department of Transportation planned construction which would block access to the shopping center. The joint venture immediately sought approval for access to the shopping center. At the same time that the joint venture was seeking approval for access, the chain entered into discussions with different developers to build a shopping center across the street. The chain ultimately notified the joint venture less than two months after it had sent the final revisions that it was not proceeding with the deal and refused to sign the lease. The joint venture, which had been experiencing financial difficulties, was unsuccessful in obtaining another prime tenant or other developer to assume the project and sued for promissory estoppel, claiming the chain's "repeated indications of interest in making a lease constituted a

promise on which they relied to their detriment." 925 F.2d at 1366. Those "promises" included certainty that the chain could make the deal worthwhile for the joint venture, assurances that it "had every intention of reaching an agreement," 925 F.2d at 1367, and finalizing the lease with them, 925 F.2d at 1373, and that it "would make the economics work out." 925 F.2d at 1371 (internal quotations omitted). The joint venture understood those promises and assurances to be an agreement to execute the lease. 925 F.2d at 1367.

The joint venture claimed they purchased the property and prepared the site specifically for the chain, the earlier letter communicated to the joint venture the acceptable terms of the lease, and the chain's real estate board had given approval. Further, the letter contained three contingencies that readily were resolved to the chain's admitted satisfaction at or near the time of the letter. 925 F.2d at 1367 n. 5.

The court in Doll determined that an issue of fact existed as to whether defendant made a promise, but found the issue of reasonableness too problematic. Although the letter detailed the basic terms of a formal lease agreement, the numerous exchanged lease drafts evidenced that issues remained. The written documents made clear the chain's "desire *not* to be bound until the final draft of a lease was executed." 925 F.2d at 1371 (emphasis in original).

The advanced promises and written documents in Doll were "wholly contradictory [for the joint venture] to assert that [the chain] 'promised' to sign a lease while simultaneously insisting that only a completed document would serve to bind it." 925 F.2d at 1372. Thus, the joint venture had no basis to contend that its reliance on the promises was reasonable. The court stated, "[i]t is difficult to imagine what else [the chain] could have done to pursue the project in this case while simultaneously avoiding being bound until a lease was signed." The court further observed that the requirement applied to both parties and provided the joint venture was an "upside." It retained the opportunity to charge higher rent to another grocery

28

store chain prior to execution of a written lease, 925 F.2d at 1373, even though reality worked out differently.

Here, as in <u>Doll</u>, plaintiffs were free to pursue other tenants to lease the space or other entities to purchase the property. Plaintiffs may not now perceive this as an upside given their circumstances took a downward turn. Nevertheless, plaintiffs, like defendants, were not bound and consistent with this state of affairs, the record reflects plaintiffs' pursuit of other deals, lease renewals, and the sale of the property.

The provisions in the executed April 5, 2006 LOI stated clearly that an executed lease agreement was required before the parties would be bound. The other documents also support this understanding. It is difficult to imagine what more Wal-Mart could or should have done to make this clear while still pursuing the potential project with plaintiffs. Further, plaintiffs have adduced no evidence that defendants back-tracked on their position that an executed lease was required or that each party would bear its own costs in furtherance of the contemplated deal. Statements such as "a lease would be executed in two weeks" do not provide sufficient evidence to establish otherwise.

Moreover, as the signed writings by the parties contradict plaintiffs' position, defendants cannot have reasonably expected that plaintiffs would be induced to act in supposed ignorance of those express provisions—provisions that plaintiffs now contend they typed out and included specifically at "Wal-Mart's behest." In other words, because Wal-Mart required them.[7] Such action by plaintiffs instead could be found only to have been induced by the

---

[7] It is unclear for what purpose plaintiff now has clarified that these provisions specifically were required by Wal-Mart as the provisions were both mutually agreed to and unambiguous. It stands to reason that by virtue of Wal-Mart requiring these provisions and by plaintiffs agreeing to them, plaintiffs were on notice that defendants intended no agreement would exist until there

promisee's mistaken judgment.  Compare  Burton Imaging Group v. Toys "R" Us, Inc. 502 F. Supp. 2d 434, 440 (E.D. Pa. 2007) (statement that a party is "going to move ahead" as long as everything passed a specific test insufficient promise for claim of detrimental reliance as a matter of law where, although everything passed the test, the statement could not be interpreted to mean passing the test was both necessary and sufficient; consequently, the resulting action was not in reasonable reliance but a reflection of the party's reliance on its own mistaken judgment).

### D.  Enforcement Not Required to Avoid Injustice

The Pennsylvania Supreme Court has found comment b to the Restatement Second of Contracts § 90 instructive when considering whether enforcement of the promise is required to avoid injustice.  Thatcher's Drug Store of West Goshen, Inc., 636 A.2d at 160.  "As the last clause in the formulation [of equitable estoppel] makes clear, not every promise on which a party reasonably and foreseeably relies is enforceable."  Massaro Ltd. Partnership v. Baker & Taylor, Inc., 161 F.App'x 185, 187 (3d Cir. 2005).  The lack of formality of the asserted promise is an important consideration in determining whether injustice will result if the promise is not enforced.  And the Massaro court observed that the lack of formality presented by an oral promise that approval by the defendant's board was a mere formality only became more striking when "the promise and the text of the LOI" were examined together.  161 F. App'x at 188.

Similarly, as discussed *supra*, Rottler's statements that a contract would be executed or that a closing would occur, though the closing and document execution repeatedly did not

---

was an executed document and intended that both parties proceed at their own risk and bear their own costs and expenses in pursuing the deal.

happen, are quite informal when contradicted with the text of the executed LOI. <u>See</u>
RESTATEMENT (SECOND) OF CONTRACTS, § 90, cmt. b

Where a party takes calculated business risks to pursue a project in furtherance of the
potential profits which may be generated by a successfully completed deal, "the tenets of
equity do not demand that the promises . . . should be enforced because no injustice results
when a party relies on its own business judgment to pursue a potential business opportunity
and ultimate success in the endeavor is not achieved." <u>Johnson v. Dunkin' Donuts</u>
<u>Franchising, L.L.C.</u>, 2014 WL 2931379, at *26 (W.D. Pa. June 30, 2014). As the court in
<u>Johnson</u> aptly observed, "[l]ike many business deals involving sophisticated entities and
businesspeople, this project failed." 2014 WL 2931379, at *26. Plaintiffs' deal with Wal-Mart
involved calculated business risks and likewise failed.

As in <u>Johnson,</u> the court in <u>Josephs</u> determined that the actions of the plaintiffs were the
result of their own will and business judgment as opposed to enforceable reliance. 733 F.Supp.
at 227. <u>Josephs</u> involved negotiations between prospective purchasers of a building and a party
interested in leasing space for a Pizza Hut franchise. The purchasers were required to have two
tenants in order to obtain financing for the purchase. A representative of Pizza Hut allegedly
promised to lease the building from the purchasers and further indicated that corporate
approval for the lease was a mere formality. But a letter from Pizza Hut indicated approval
was not guaranteed. After the purchasers obtained financing and purchased the property, the
lease was rejected by Pizza Hut's corporate officials and not executed. The purchasers then
were told that Pizza Hut would approve the lease in the near future. The representations in
<u>Josephs</u> that Pizza Hut would lease the space in the property following the purchase were
insufficient to support the claim for promissory estoppel where they effectively were
undermined by a letter stating that approval could not be guaranteed. In other words, "[t]heir

expectations were not formed on the basis of a legal binding contract or on the representation that a legally binding contract existed" but instead were the product of their own will and judgment. Id.

Here, reliance on statements that a lease would be executed or that a closing would occur in the future were not based on a written contract or concrete presentations that a binding agreement existed. To the contrary, it resulted from Landen's own will and judgment.

Plaintiffs cite <u>Thomas v. E.B. Jermyn Lodge No. 2</u>, 693 A.2d 974 (Pa. Super 1997), arguing they expended large sums of money to comply with the terms of the promise in reliance on the promised ground lease. Reliance on <u>Thomas</u> is unavailing. <u>Thomas</u> did not involve two businesses negotiating a deal. Instead, it involved a specific promise to pay certain expenses. In <u>Thomas</u>, the court upheld a jury verdict in favor of the plaintiff on his claim for promissory estoppel where the plaintiff's fraternal lodge had promised that if he hired an attorney to defend him on criminal charges, the lodge would reimburse him for the attorney's fee. Plaintiff hired an attorney, borrowed money to pay the attorney's bill and then sought reimbursement. The lodge refused to reimburse the plaintiff. The plaintiff provided evidence that he followed the same procedure he previously had when successfully obtaining pre-approval for reimbursement of attorney's fees from the lodge. He testified that he would not have hired the attorney if he did not have pre-approval as he had to borrow the money for the legal fees.

In <u>Thomas</u>, unlike the case *sub judice*, the lodge specifically promised reimbursement of certain expenses that were then incurred in reliance on the promise. The promise was sufficiently concrete and related directly to the damages.

Here, in contrast, the asserted representations to have an agreement, close on the deal, and/or execute the written lease are not such a promise. The only relevant "promise" regarding

32

the expenses of each party in furtherance of the deal was that they each decided that they would bare their own costs in pursuing the deal.  Thus, <u>Thomas</u> does not support plaintiffs' position and indeed counsels against it.

<u>Massaro</u>, 161 F.App'x 185, raises similar concerns with plaintiffs' assertions regarding injustice.  <u>Massaro</u> involved a letter of intent between the parties regarding a possible lease of the commercial premises owned by the plaintiff and unequivocally required approval of the defendant's board.  The defendant, however, had stated that board approval was a mere formality.  The court observed that enforcement of the promise to enter the lease was not necessary to avoid injustice where the loss could have been avoided.  The court opined: the plaintiff "was in the course of negotiating the LOI at the time the promise was made.  Had it wished to rely on the defendant's assurance that board approval was a 'mere formality' and that [the defendant] was committed to leasing the premises, it could have bargained to have this language included in the LOI."  <u>Massaro</u>, 161 F.App'x at 189; <u>accord</u> <u>Kreutzer v. Monterey Cty. Herald Co.</u>, 747 A.2d 358, 362 (Pa. 2000) ("[P]ersons of ordinary prudence will modify a writing with another in any matter of importance.").  The court further observed that the plaintiff understood the importance of having the defendant's commitment in writing as it had pressed for a signed LOI.  The indefinite character of the plaintiff's reliance counseled against enforcing the promise.

In the instant matter, defendants aptly argue that injustice does not result because plaintiffs should have reduced to writing the promises on which plaintiffs now contend they relied.  Plaintiffs retort that they "<u>attempted</u> to put the promises in writing,"  (Doc. No. 109, at p. 11) (emphasis added), and assert they did so by negotiating a number of ground leases and a final ground lease in July of 2007.  (Doc. No. 109, at p. 9).

Plaintiffs miss the point. Defendants' argument and <u>Massaro's</u> reasoning is not just that the deal with Wal-Mart should have been reduced to writing, which was required both by the Statute of Frauds and the executed LOI, but rather that, if plaintiffs actually required that their expenses and costs be covered by Wal-Mart, then they should have reduced that demand to a signed writing before proceeding on their contrary assumption. Even in the absence of the express provisions of the LOI to the contrary, plaintiffs' assumption would be imprudent. Under such circumstances, no deterrent function is served by permitting plaintiffs to proceed under promissory estoppel.

Plaintiffs also offer that Landan sought to have Wal-Mart make an option payment, but Wal-Mart refused. (Doc. Nos. 118 at 8; 110, at ¶ 84). A reasonable person, much less reasonable businessperson, would not take this to mean that plaintiffs and Wal-Mart could expect Wal-Mart subsequently to bear the burden of this expense. Nevertheless, plaintiffs now seek reimbursement for that payment and others. Wal-Mart's refusal simply reconfirms the understanding of the parties as outlined in the initial loan proposals and LOI—that both parties were responsible for their own expenses in furtherance of the potential deal.

Plaintiffs point to the numerous occasions that Landan contacted Rottler to confirm that the lease would be executed, though it did not occur time and time again. (Doc. No. 118, at p. 8). Repeatedly attempted but failed requests to put promises in an executed writing or to hold a scheduled closing could not have provided plaintiffs with a reasonable basis to expend sums in reliance on what they knew they had not yet successfully accomplished—an executed written ground lease. To the contrary, the repeated unsuccessful attempts could only have given them pause in assuming that they had a deal or agreement, and they should have acted accordingly. Reliance on such a hope or "hunch" that a deal would be finally executed is insufficient for promissory estoppel. <u>Bennett</u>, 572 F.App'x at 84.

To the extent plaintiffs seek to have defendants reimburse them for the fees, expenses, and costs incurred in undertaking due diligence for a ground lease, they did not seek to have that specific understanding memorialized. As the LOI made clear, the parties were operating with the understanding that they would bear their own expenses and costs. To the extent plaintiffs formed a different understanding they should have clarified that understanding with Wal-Mart before assuming to the contrary. Equity cannot condone that mistaken assumption. In other words, enforcement of any claimed promises is not required to avoid injustice.

V.     CONCLUSION

Given the foregoing, summary judgment against plaintiffs on their remaining claim for promissory estoppel is proper. Plaintiffs have adduced insufficient evidence to support a finding by a reasonable jury that: 1) they reasonably relied; 2) on a definite promise; and 3) that injustice can only be avoided by enforcement of the claimed promise. As all three of these are essential elements and plaintiffs' evidence is deficient on each, summary judgment is proper. Celotex Corp., 477 U.S. at 322-23.

For the reasons set forth above, defendants' motion for summary judgment on plaintiffs' claim for promissory estoppel (Doc. No. 103) will be granted. An appropriate order will follow.

Date: September 22, 2016


                                                  s/David Stewart Cercone
                                                  David Stewart Cercone
                                                  United States District Judge

cc:    Marvin Leibowitz, Esquire
       Kevin Batik, Esquire
       Akiesha Gilcrist, Esquire
       Bryan Brantley, Esquire
       Matthew Monsour, Esquire

       (*Via CM/ECF Electronic Mail*)

35